UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X        **Docket#**
UNITED STATES OF AMERICA,      :       07-CR-736(CPS)(JMA)
                               :       08-CR-44
                               :
    - versus -                 :       U.S. Courthouse
                               :       Brooklyn, New York
                               :
ARTHUR DOZORTSEV AND           :
NIKOLAI DOZORTSEV,             :       April 2, 2009
            Defendant          :
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR
VIOLATION OF PRETRIAL RELEASE
BEFORE THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Government**:          **Benton Campbell, Esq.**
                                 United States Attorney

                        BY:      **Steven Tiscione, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201


**For Defendant N. Dozortsev**:**Barry Zone, Esq.**

**For Defendant A. Dozortsev**:**Edward Sapone**, Esq.



**Official Transcriber**:        **Rosalie Lombardi**
                                       **L.F.**



**Transcription Service**:       **Transcription Plus II**
                                 821 Whittier Avenue
                                 New Hyde Park, N.Y.  11040
                                 (516) 358-7352
                                 Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

## Proceedings

1          THE CLERK:  Criminal Cause for Violation of

2   Pretrial Release, case number 07-cr-736 and 08-cr-44,

3   United States v. Nikolai Dozortsev and Arthur Dozortsev.

4          Counsel, please state your name for the record.

5          MR. TISCIONE:  Steven Tiscione for the

6   government.

7          Good afternoon, your Honor.

8          MR. ZONE:  Barry Zone for Nikolai Dozortsev.

9          Good afternoon, your Honor.

10         MR. SAPONE:  And good afternoon, your Honor.

11         My name is Edward Sapone and I am here for

12   Arthur Dozortsev, along with my associate Brianna Serra

13   (phonetic).

14         MS. SERRA:  Good afternoon, your Honor.

15         THE COURT:  Good afternoon.

16         Counsel, have you explained to your clients

17   that they have been charged in this complaint with

18   violating their conditions of release?

19         Mr. Sapone, did you explain that to your

20   client?

21         MR. SAPONE:  I did; yes.

22         THE COURT:  Mr. Zone?

23         MR. ZONE:  Yes, your Honor.

24         THE COURT:  Okay.  And what is the government's

25   position about bail?

3

**Proceedings**

1          MR. TISCIONE:  Your Honor, given the fact that

2    the defendants were released on a very substantial bond,

3    both of them, the defendant Nikolai Dozortsev was even on

4    home detention with electronic monitoring and yet the

5    defendants combined to commit over 180 acts of Medicaid

6    fraud while on release.  The government's position is

7    that they should be remanded without bail.

8          THE COURT:  Who wants to go first?

9          MR. SAPONE:  Would Nikolai like to go first?

10          MR. ZONE:  Sure.  Your Honor, the first thing I

11    would explain to the Court and I have been in touch with

12    Ms. Lee who is the person from pretrial who has been

13    supervising Mr. Dozortsev, her position --

14          THE COURT:  (inaudible).

15          MR. ZONE:  I'm sorry?

16          THE COURT: Yes, go ahead.

17          MR. ZONE:  Her position is that the only

18    modification she suggests that instead of being able

19    to --

20          THE COURT:  Hold on.  Does Ms. Lee know the

21    nature of the violation?  Do you know the nature of the

22    violation?

23          PRETRIAL SERVICES OFFICER:  It's a healthcare

24    charge fraud --

25          THE COURT:  Yes.

4

### Proceedings

1      PRETRIAL SERVICES OFFICER:  -- is my
2  understanding.
3      THE COURT:  Yes.  And are you recommending the
4  be released?
5      PRETRIAL SERVICES OFFICER:  I recommend Nikolai
6  Dozortsev be released.
7      THE COURT:  Why?
8      PRETRIAL SERVICES OFFICER:  Because he has been
9  compliant on pretrial services supervision.  He is on
10  home detention.
11      THE COURT:  Describe to me then, excuse me,
12  what Nikolai has committed since he has been on pretrial
13  release.
14      MR. TISCIONE:  156 acts of healthcare fraud by
15  submitting false claims for Medicaid benefits while he
16  has been on release.  I mean the idea that he has been
17  compliant by pretrial services --
18      THE COURT:  There was just a disconnect here
19  because I know --
20      MR. TISCIONE:  He's also been convicted.
21      THE COURT:  Excuse me.  Let me just finish.
22      MR. TISCIONE:  Sorry.  I apologize.
23      THE COURT:  I read the complaint, as you know.
24  I get here today and I read the pretrial report and I am
25  thinking is this -- is the wrong name there?  I mean, I

Transcription Plus II       Rosalie Lombardi

5

**Proceedings**

1  just don't understand.  And he's pled guilty.

2          MR. TISCIONE:  He's pled guilty.  He's on

3  pretrial -- he's on release pending sentencing.

4          MR. ZONE:  Judge, this isn't the case.

5          THE COURT:  And how much of the -- tell me the

6  period of time, like when you allege it began.

7          MR. TISCIONE:  The healthcare fraud?

8          THE COURT:  Yes.

9          MR. TISCIONE:  The healthcare fraud began in

10  2003.  He was charged with healthcare fraud between 2003

11  and October of 2007 in an indictment.

12          THE COURT:  Right.

13          MR. TISCIONE:  That was what he was -- he was

14  arrested in October of 2007.

15          THE COURT:  Right.

16          MR. TISCIONE:  And --

17          THE COURT:  And that's when he appeared before

18  Judge Gold.

19          MR. TISCIONE:  And that's when he appeared

20  before Judge Gold.  And the offense that he is charged

21  with now is committing healthcare fraud between the date

22  of his release, October 15, 2007, and March 1, 2009.

23          THE COURT:  And so did he essentially just keep

24  doing what he was doing before?

25          MR. TISCIONE:  Yes.

6

### Proceedings

1          THE COURT:  Or did he vary it or tailor it?

2          MR. TISCIONE:  The exact same thing; just kept

3     doing it.

4          THE COURT:  And this would have been something

5     he could have done and still ostensibly complied with his

6     pretrial conditions.

7          MR. TISCIONE:  Meaning --

8          THE COURT:  I mean shown up and reported?

9          MR. TISCIONE:  Yes, absolutely.

10         PRETRIAL SERVICES OFFICER:  Well, we're asking

11    that he could be on house arrest, full lock down.  He

12    currently, prior to his arrest, he had a curfew to be

13    allowed out of the house.

14         THE COURT:  But how blatant.  I mean, this is

15    somebody who not only was released and is advised at the

16    time of release because I am sure Judge Gold does like I

17    do, if you commit a crime while you're out on this bond,

18    that is number one, another crime.  Why should the Court

19    accord this defendant any level of trust anymore?  I mean

20    he did this right under your nose.

21         MR. ZONE:  That's not the case, your Honor.

22         THE COURT:  Okay, Mr. Zone.  I am sorry.

23         MR. ZONE:  I'm really sorry.

24         THE COURT:  Let me -- you come join our

25    conversation.

7

**Proceedings**

1          MR. ZONE:  I have been -- this is what I have

2   done for the past year of my life, this case.

3          THE COURT:  No.

4          MR. ZONE:  I swear to God.  That's what I have

5   been doing is this case for the past year.  So there's so

6   much here that's giving you a misapprehension of what

7   went on; okay?  Now, we started with this, and I know

8   you've read -- Mr. Tiscione has spent a tremendous amount

9   of time putting this together and it explains this very

10  extremely sophisticated on and offshore crime that took

11  place that Mr. Dozortsev -- when all was said and done,

12  we resolved it all; okay?  We resolved it with a plea.

13  We came up with a number.  We came up with a forfeiture

14  amount.

15          And after we basically -- during our plea

16  negotiations, Mr. Tiscione said by the way, we have a

17  $12,000 Medicaid fraud situation that we want him to

18  plead guilty to for acts that he committed between 2003

19  and 2006.  That's a three-year period.  I said why, we're

20  pleading guilty to money laundering.  We've come up with

21  a number.  You realize there were three defendants now;

22  there was somebody who -- Mr. Shargel represented and

23  then Mr. Sapone's client and my client.  So this was

24  really -- it took us a year to get this case resolved.

25          And I also, not only dealt with Mr. Tiscione, I

8

## Proceedings

1  dealt with their forfeiture division who said every time

2  I would call, well that sounds fair but I've really got

3  to make a call and get it approved but that sounds like a

4  fair -- and I would get an e-mail that was fairly

5  inconsistent with the conversation that I would have.

6          And then we were talking about how are we going

7  to figure out the Medicaid issue.  And he said to me 100

8  percent, I will speak with Medicaid and we will find out

9  what the total number was.  This was in the end -- when

10  did he plea guilty, Steve?

11          MR. TISCIONE:  November '07.

12          MR. ZONE:  Okay.

13          MR. TISCIONE:  So November of '07.

14          MR. ZONE:  November; okay.  So up to a few

15  months ago, okay, Medicaid had presumably given all of

16  their information to the United States Attorney's Office.

17  Okay?  So I understand this looks like this has been

18  going on.

19          Now I will tell you exactly what my client's

20  issue is, he's been to the doctor three times, okay, in

21  the past 18 months to his cardiologist.  He has high

22  blood pressure and high cholesterol.  I have high

23  cholesterol, too.  The reality is he's had a few

24  prescriptions refilled and that's the extent of his

25  medical treatment.

9

## Proceedings

1          When I told him, because we didn't know about
2    the Medicaid aspect of this case when he first got
3    arrested and when he was out on bond, when I told him
4    about it, he immediately canceled his Medicaid because in
5    this community and many communities, there are people
6    that are agents of insurance companies that say that
7    you're entitled to certain types of insurance and he was
8    counseled that he was based on his income, things have
9    been bad, the economy is bad.  He's not doing very well.
10   He has a family of four to support.  His wife doesn't
11   work.  And realistically, he's been to the doctor three
12   times.  He had a handful of refills for blood pressure
13   and cholesterol medication.
14          So I know how this looks but I also know what
15   went into getting this case resolved.  Mr. Dozortsev has
16   not continued to commit crimes and if Mr. Tiscione who at
17   the very beginning of this said, well do you know what,
18   we're really just going to look to use this as relevant
19   conduct at sentencing if your client disagrees with us.
20   That's really what this comes down to.  Okay?  And
21   sentencing is a couple of months ago and now based on
22   these allegations, it's my view that I need to speak -- I
23   need to find out from Medicaid what their allegations are
24   because it seems to me that if the numbers are what he
25   says they are, then it could very well be that whatever

10

## Proceedings

1  pharmacy is or wherever they're refilling his

2  prescriptions, are playing games.  He's told me exactly

3  what's gone on.

4           I am in touch with him every day of my life for

5  sentencing; okay?  There's a forfeiture issue.  We're

6  resolving the forfeiture issue.  This is all a very

7  ornate resolution to a case that quite frankly, this will

8  not even change his guideline exposure.  Maybe the Judge,

9  Judge Sifton, will think, you know, if there are a few

10 times that he used -- he went to a doctor and Medicaid

11 paid for it, he shouldn't have, but that's certainly

12 something we can argue at sentencing.

13          Like I said, this isn't the kind of situation

14 that Mr. Tiscione spells out here.  I would suggest that

15 at a bare minimum, we're not talking about years before

16 sentencing.  Give us an opportunity where if you --

17 pretrial is recommending that he be home detained.  My

18 position is that he should be able to support his family.

19 If the Court is not comfortable with that and requires

20 him to be at home, then he will be at home.  He can work

21 from home but he needs to support his family.

22          As you know before sentencing, courts sometimes

23 will even give time to surrender.  This is all part of a

24 sentencing argument, a sentencing issue and that's where

25 it belongs.  I tell you, he did not commit another act of

11

**Proceedings**

1   insurance fraud and all of these allegations, I have no

2   information about.  I have spoken with my client.  At a

3   bare minimum, he's been fully compliant and I applaud,

4   you know, of course pretrial for standing her ground.

5           All I am saying to you, Judge, is give the guy

6   an opportunity to argue these sentencing issues so we can

7   argue to Judge Sifton that it shouldn't impact his

8   sentence.

9           THE COURT:  But you're making it sound like

10  it's a mistake the drugstore might have made.

11          MR. ZONE:  It may be.  I have been given some

12  information that certainly believes me to believe that.

13  It doesn't --

14          THE COURT:  Do you want to describe to me the

15  nature of the conduct?  I mean, I don't want to fault

16  pretrial because he could ostensibly be in compliance and

17  you wouldn't know he was committing financial crimes.

18  You would have no way of knowing.

19          MR. TISCIONE:  Sure.  The defendant's submitted

20  fraudulent affidavits to Medicaid every year since 2003

21  in which he misrepresented his assets and income and

22  applied for benefits to which he was not entitled.  And

23  then over the course of virtually on a weekly basis,

24  since 2003, has collected Medicaid benefits.

25          And this defendant, as I said, committed 156

12

**Proceedings**

1  acts since the day of his arrest on October 15, 2007

2  including over $50,000 worth of healthcare benefits since

3  that time.  The government did not know about this most

4  recent Medicaid fraud until after the defendant pled

5  guilty and in preparation for sentencing, the government

6  contacted Medicaid to find out the precise amount of the

7  loss.  And that's when we were first informed by Medicaid

8  officials that these defendants were still receiving

9  Medicaid benefits to that day.  So we went back --

10            THE COURT:  So they were not suspended from the

11  Medicaid program --

12            MR. TISCIONE:  No, and that --

13            THE COURT:  -- at the time of the plea?

14            MR. TISCIONE:  No, they were not.  And I fault

15  Medicaid every bit as much for not terminating their

16  benefits the second they were arrested but they didn't.

17  And I didn't even know about it until we contacted

18  Medicaid after their plea to prepare for sentencing.  And

19  it took another two months after that to get the Medicaid

20  records from Medicaid before I could bring this action.

21            THE COURT:  So the plea was like a blip on

22  their screen.  I mean, was the criminal activity after

23  the plea the same as the criminal activity before the

24  plea?

25            MR. ZONE:  I don't know what the criminal

13

**Proceedings**

1 activity is, Judge.  Mr. Dozortsev saw the doctor since

2 the plea, the cardiologist, twice, two times.  And

3 there's maybe been one refill of medication, okay?  I

4 really am looking at this and reading all of this and I

5 can't convey to the Court how extensive our negotiation

6 was to resolve this case and how many calls went back

7 between myself, Mr. Tiscione, and all --

8            THE COURT:  But you -- go ahead.

9            MR. ZONE:  I just tell you, this was -- and the

10 day of the plea, we got a final number, it was $12,000

11 over a three year period.  So I can just say to you this

12 is --

13            THE COURT:  Yes, but as of the day of the plea

14 it was $12,000 or maybe -- I don't know what it was but

15 the trouble is, there was conduct after the plea.

16            MR. ZONE:  But not 100 -- how many acts?

17            MR. TISCIONE:  156.

18            MR. ZONE:  I don't know 156 --

19            MR. TISCIONE:  But not since the plea.

20            MR. ZONE:  It wasn't since the plea, 156 acts.

21 He's saying that since before the beginning of the case.

22            THE COURT:  How many since the plea?  I mean

23 then it starts to -- you might want to suggest these are

24 mistakes but it depends upon how many there are since the

25 plea.

14

### Proceedings

1      MR. TISCIONE:  Since the plea there were 36.

2      MR. ZONE:  And I am telling you, he was at the

3  doctor twice and maybe refilled a couple of times.  And I

4  have spoken to the client extensively.  I am in touch

5  with the client every day.  I am in touch with the

6  government almost every day.  This is not some case that

7  sat on a back burner.  We're all preparing for

8  sentencing.  They all know how much they have to lose.

9  And this plea has been so extensive -- I have never

10  negotiated a plea in my life as I have negotiated this

11  plea.

12      And I would say to you, Mr. Dozortsev would not

13  do something as stupid and as simple as this under these

14  circumstances unless his understanding was accurate.  So

15  my position is, let us argue this at sentencing because

16  this is going to be a sentencing issue.

17      THE COURT:  Do you want to be heard,

18  Mr. Sapone?

19      MR. SAPONE:  Yes, I would.  May it please

20  your Honor and the government and all the folks at side-

21  bar, Ms. Lee is recommending for Arthur Dozortsev not

22  even an electronic bracelet or home monitoring.

23      UNIDENTIFIED FEMALE VOICE:  Her name is Rivera.

24      MR. SAPONE:  It's actually Ms. Rivera.  Excuse

25  me.  Just a bond, an additional bond.  He's already out

15

**Proceedings**

1  on a $1 million bond.  They suggest no bracelet, no home

2  detention, just an additional bond secured by property

3  and signatures.

4          What I suggest the Court consider --

5          THE COURT:  No, I think she suggests -- well I

6  have electronic monitoring but go ahead.

7          MR. SAPONE:  I think what she said was a 9 p.m.

8  curfew and after that, it would be the monitoring but he

9  doesn't -- he can be at liberty until 9 p.m.

10          But in any event, your Honor, he owns an

11  apartment here in Manhattan where he lives.  His fiance

12  is here in court, as well as his family.  His fiance just

13  recently moved into that apartment.

14          THE COURT:  What do they do for a living?

15          MR. SAPONE:  He works for Dozortsev and Sons

16  Liquors, as a salesman.  So he sells the wines locally

17  for the company.

18          THE COURT:  How was he ever entitled to

19  Medicaid?

20          MR. SAPONE:  Meaning initially?  Because I

21  think the application --

22          THE COURT:  Whatever; don't answer that.

23          MR. SAPONE:  Sure.  In any event, the apartment

24  has $600,000 of equity.  It's an apartment that he and

25  his fiance --

16

### Proceedings

1      THE COURT:  Wasn't it already posted?

2      MR. SAPONE:  No, a different apartment was.

3      MR. TISCIONE:  It was originally posted.

4      THE COURT:  Oh.

5      MR. TISCIONE:  But then that property was

6  removed in substitution for another property.  So it's

7  not currently --

8      MR. SAPONE:  So that's a lot.  I mean, most

9  respectfully, it's a lot of money we're talking about if

10 you wanted to add the $600,000 to the million.  There's

11 moral suasion because he would have no place to live and

12 his fiance would have no place to live.  His fiance can

13 sign a bail bond.  His father is in court, who has assets

14 at around $1 million.  He can sign a bond if you thought

15 that was necessary.

16      But basically, I don't think it is and here's

17 why.  What this boils down to as to Arthur Dozortsev and

18 no disrespect to the folks to my left, but there's a lot

19 of large numbers being thrown around, 156 instances of

20 this and all of these hundreds of thousands of dollars of

21 that.  As this case relates to Arthur, it is actually

22 only $10,000 where he went to the doctor or got medicine

23 27 times.  So of the 160 or 70 instances, only 27 are

24 relating to Arthur and of all of the money that was

25 gained, if you will, it only is $10,000.

17

### Proceedings

1    And so what we have is a guy who allegedly was

2    going to the doctor and getting medicine.  Now what's

3    interesting, your Honor, about this is that he was

4    released in this case in October of 2007.

5         THE COURT:  Right.

6         MR. SAPONE:  All right.  But he was first

7    accused of the healthcare fraud on August 14 of 2008.  So

8    the first time he knew that there was an accusation in

9    the world against him concerning this conduct of going to

10   the doctor and getting medication, was August 14, 2008.

11   He immediately applied for private insurance, Oxford,

12   which I have proof of and I would like to hand it up.

13   And it's Oxford Benefits, the effective date here on the

14   form is August 8, 2008.  So he's told in August of '08,

15   hey we're accusing you in a superseding indictment of

16   going to the doctor and getting medication when you

17   shouldn't be.  So he immediately goes and gets private

18   insurance that same month.

19        That goes until January 31 of this year, of

20   '09, at which point he switches to Aetna and he's had

21   insurance the whole time.  So there would be no reason to

22   present a Medicaid card at a doctor's office or a

23   pharmacy, at least from August of '08 until now because,

24   in fact, he was fully covered by private insurance.

25        So three months after the government tells him,

18

**Proceedings**

1   hey Mr. Dozortsev, we're accusing you of healthcare fraud

2   in the superseder, he accepts responsibility fully to the

3   count of healthcare fraud which is Count 19 in S-3,

4   superseder number 3 and he pleads guilty and accepts

5   responsibility.

6           Your Honor asked a very good question as to

7   Nikolai Dozortsev, well how many times did he get the

8   benefit, go to the doctor or get medicine after the plea?

9   And I don't know what the answer was because it doesn't

10  relate to my client but here our position is zero.  The

11  government's position is two; that he either went to the

12  doctor once and got medicine once or got medicine twice

13  or some combination.

14          So that's what we have.  And what Mr. Zone was

15  alluding to earlier was that we spent months negotiating

16  the disposition.  And what's relevant about it is not

17  just that we negotiated, but that we asked the government

18  who was professional the whole time, give us the extent

19  of the healthcare fraud, how much money are we talking

20  about because we have to accurately pay restitution.  And

21  we agreed to pay all of it as it relates to Arthur.  In

22  other words, if it was $30,000 in doctor visits and

23  medicine that he gained that he shouldn't have through

24  the Medicaid, we were going to pay every dime of it back.

25          And I don't have the exact number with me but

19

**Proceedings**

1   it's around $30,000 and that number was gotten -- I

2   remember sitting in the diner across the park on the day

3   of the plea and the number was $30,000 and we came right

4   into court and we said fine, $30,000 it is.  And he

5   started paying it already.  So the point is, we didn't

6   know about any of it and nothing happened after the plea.

7          Now with respect to the Court's consideration

8   of danger to the community and risk of flight, I suggest

9   to your Honor that the only danger relevant here,

10  arguably is that hey, this man is going out to the doctor

11  and getting medicine when he shouldn't be.  That no

12  longer exists because he has private insurance in effect

13  through Aetna.

14         With respect to risk of flight, he's been

15  working full time since his release in 2007.  He's

16  complied with pretrial services.  He's traveled and

17  returned to New York.  He has submitted himself to random

18  drug testing and in each instance has passed that,

19  meaning the results were negative.

20         And I want to correct something in the pretrial

21  report, it says on page 1 that he's abused marijuana.

22  That is old information prior to the arrest.  It's not

23  new.

24         Now since the plea, since the plea in November

25  of '08, I can tell you that he's been continuing to work

20

**Proceedings**

1  full time, complying with pretrial, traveling and

2  returning, passing every drug test and working on  the

3  sentencing with his lawyer almost on a daily basis.

4  Almost on a daily basis does this man call my office or

5  come to my office to work on sentencing because his range

6  is 18 to 24 months.  And he wants to get probation.

7           And he has devoted his life with his family and

8  his fiance to do nothing but work full time and work with

9  is lawyer getting letters, doing community services --

10  and he's done it all.  I have in my office, your Honor,

11  and I think Ms. Serra probably has the accurate number

12  but around 100 letters from folks in the community

13  ranging from a local senator, Kruger, in Brooklyn here in

14  Kings County to family members to friends, to folks he's

15  met overseas; over 100 letters.  And he works with me in

16  preparing my sentencing submission for Judge Sifton.  We

17  were just interviewed by probation.  The very day after

18  the interview, we were back downtown with all the

19  financial to give to the probation officer.  And so he's

20  complied in every way.

21           He's responsible.  He has no reason whatever to

22  flee this jurisdiction.  But if your Honor believes that

23  because he allegedly went to the doctor 27 times or got

24  prescription medication, none of which happened after the

25  plea, if you believe that the bond should be augmented by

21

**Proceedings**

1    offer of the place he and his fiance live in, $600,000 of

2    equity, and the two signatures of his father and fiance

3    here in court.

4              THE COURT:  Do you see these defendants -- do

5    you see significant differences between them in terms of

6    the conduct post-plea?

7              MR. TISCIONE:  Post-plea, there's only minimal

8    --

9              THE COURT:  Well, I say post -- I mean, why

10   don't you arrest what Mr. Sapone said about him going and

11   getting the private insurance and --

12             MR. SAPONE:  Oh, let me hand it up, please.  I

13   showed Mr. Tiscione earlier.  The first one is Oxford and

14   the second is Aetna.

15             THE COURT:  Yes.  Go ahead.

16             MR. TISCIONE:  Well one difference obviously is

17   the fact that Nikolai Dozortsev has continued to commit

18   Medicaid fraud well after the plea.  I believe Arthur

19   Dozortsev only committed two acts after the plea.  I

20   don't know why he would have committed those acts if he

21   had private insurance since August but it's there

22   nonetheless.

23             I think there's a couple of things that

24   your Honor should keep in mind.  Number one, I certainly

25   do not dispute what both defense attorneys have said.

22

### Proceedings

1   This has been a very long negotiated plea disposition in

2   this case but I submit to you, that's completely

3   irrelevant because quite frankly, if the government had

4   known about any of this conduct, we would have moved to

5   revoke their bonds as soon as we found out about it.

6          The fact that we didn't find out about it until

7   after their pleas doesn't mean that they should somehow

8   be given some benefit for that.  We only found out about

9   it recently.  The fact is, they're now -- they now stand

10  before your Honor as convicted felons, not in a position

11  where they're being released pretrial.  And as your Honor

12  knows, under 18 USC 3143(a)(1), the standard for bail for

13  post-conviction, pre-sentence is a much higher standard.

14         The defendants have to prove by clear and

15  convincing evidence that they are neither a risk of

16  flight nor a danger to the community.  By being convicted

17  for serious crimes, including money laundering, these

18  defendants are presumed to be a danger to the community

19  and I think the fact that they went out and committed all

20  of these acts of crimes while they were out on release

21  just demonstrates how dangerous they are.  And danger

22  doesn't have to be that they're going to go out and

23  commit violent crimes.  Danger could be that they're

24  going to go out and defraud the government or defraud

25  other people.

23

**Proceedings**

1          And I think it's also worth noting that these

2   defendants have very strong ties overseas.  Both of these

3   defendants have made frequent, foreign travel, obviously

4   not while they've been on pretrial release but prior to

5   that they have.  Both defendants had huge bonds.  They

6   had many people sign the bonds for them and yet they

7   continued to commit crimes, even though they were

8   specifically advised by the judge that committing any

9   crime while they were on released would be a violation of

10  their condition.

11         I mean the argument that Arthur Dozortsev

12  didn't know that we charged him with healthcare fraud

13  until August is ridiculous.  We don't have to tell him

14  that he's being accused of healthcare fraud for him to

15  know that it's illegal to submit a false affidavit to

16  Medicaid, for him to know that he can't commit any crime

17  while he's on pretrial release.

18         The fact that he wasn't charged for the

19  Medicaid fraud at his initial arrest makes no difference.

20  The fact is, he committed at least 27 acts of healthcare

21  fraud since he was released on bond.

22         MR. SAPONE:  The significance, your Honor, goes

23  to danger to the community and the fact remains that when

24  Arthur Dozortsev was confronted with the accusation on

25  August 14, 2008, he immediately got private insurance and

24

**Proceedings**

1  has used it ever since.

2          MR. ZONE:  And I will speak to the private

3  insurance issue.  Mr. Dozortsev, unlike Arthur Dozortsev,

4  he has a family of four.  He's four months in arrears on

5  his mortgage.  He is completely broke, your Honor.  He

6  owes everybody.  So I would indicate that he canceled his

7  insurance, his Medicaid when I was informed that there

8  was some issue with Medicaid.  He canceled it.

9          And then when -- after a couple of months went

10  by and he realized they had no way to support their

11  family with medical insurance or any of that necessary

12  coverage, they reapplied.  So I would just say,

13  your Honor, that these are issues that we would pray you

14  let us litigate in front of Judge -- this is a sentencing

15  issue. It doesn't change the guidelines.

16          THE COURT:  Well, it's not.  You say it's --

17  yes, it is a sentencing issue but it's also an issue

18  about whether they committed a crime while they were out

19  on a bond.

20          MR. ZONE:  I understand.

21          THE COURT:  Yes, I agree, it's a sentencing

22  issue.

23          MR. ZONE:  I understand that but it's not that

24  simple.  It's not that clear that they committed a crime.

25          MR. TISCIONE:  Judge, I would --

Transcription Plus II        Rosalie Lombardi

25

**Proceedings**

1          MR. ZONE:  It's not that clear, your Honor.  I

2    really -- there's so much that I would submit we can show

3    that they didn't commit that crime, your Honor.

4          MR. TISCIONE:  Judge, I would suggest that

5    defense counsel's own statements in the last five minutes

6    have proven that their clients have committed crimes.

7    Mr. Dozortsev owns a $600,000 apartment.  Mr. Arthur

8    Dozortsev -- I'm sorry, it's a $1.2 million apartment

9    that he has $600,000 in equity in.  Nikolai Dozortsev

10   lives in a $900,000 house and that's not even including

11   the $2 million commercial property they own in New Jersey

12   and all of the foreign properties they own.  To suggest

13   that they even might qualify for Medicaid is outrageous.

14          THE COURT:  It's beyond me.

15          MR. ZONE:  Your Honor, it's not the case.

16          MR. TISCIONE:  It's outrageous.

17          MR. ZONE:  It's just not the case.  All of the

18   things that he's talking about right now have been

19   resolved as part of our resolution --

20          MR. TISCIONE:  They haven't been resolved.

21          MR. ZONE:  -- to the case.

22          MR. TISCIONE:  They haven't been resolved.

23   They've been resolved in the sense that the forfeiture

24   has been agreed to.  That certainly doesn't suggest that

25   they don't own the properties anymore.

26

**Proceedings**

1          MR. ZONE:  On the date that he pled guilty, I

2    had a conversation with Mr. Weitz in their forfeiture

3    division and I said how much money do we have to pay that

4    you're saying his exposure is on the --

5          MR. TISCIONE:  Because the Medicaid fraud that

6    they were charged with --

7          MR. ZONE:  -- and he gave us the number.

8          MR. TISCIONE:  -- was from 2003 to 2006.  This

9    is Medicaid fraud between the date of the arrest on

10   October 15, 2007 --

11         MR. ZONE:  But --

12         MR. TISCIONE:  -- to March 1, 2009.  That was

13   not included in the calculation.  The government had no

14   idea that that was occurring until recently.

15         THE COURT:  But I don't understand -- let me

16   ask you a question.  I mean it was clear to the

17   defendants because they entered pleas and had very

18   skilled lawyers, what the crime was here.  I mean, there

19   was no question about the Medicaid fraud.

20         MR. SAPONE:  And the point that Arthur wants to

21   raise, your Honor --

22         THE COURT:  Right?  Is that right?

23         MR. TISCIONE:  That's correct.

24         MR. SAPONE:  -- is --

25         THE COURT:  So there should be no question that

27

**Proceedings**

1    they had notice of what they could and couldn't do and

2    what is Medicaid fraud and what isn't.

3                 MR. TISCIONE:  Absolutely.

4                 THE COURT:  And you're saying that there were

5    false claims post the plea.

6                 MR. TISCIONE:  Yes, although again for Arthur

7    Dozortsev, it was only two claims that we know about.

8    For Nikolai Dozortsev, post-plea there --

9                 THE COURT:  Right, post-plea.

10                MR. TISCIONE:  -- were 32 -- sorry, 36 false

11   claims.

12                MR. SAPONE:  Your Honor, if I may?  This is

13   very important.  You raised an issue.  You say they were

14   on notice.  The moment, under this rubric Arthur

15   Dozortsev was "on notice" August 14, 2008, he immediately

16   got Oxford private insurance and then Aetna and has

17   always had private insurance since then.

18                His claim is post-plea zero times that he used

19   anything concerning Medicaid and here's why.  He has

20   common sense.  If he has -- if the plea is November of

21   2008, but he has private insurance that's being paid for

22   every single month back from August of 2008, why would he

23   use Medicaid after November of 2008 when he has private

24   insurance in place through Oxford?

25                THE COURT:  But I mean frankly, he was

28

**Proceedings**

1  arraigned on this -- he was arraigned in October '07.

2         MR. SAPONE:  Not on healthcare fraud.  This is

3  a superseding indictment, your Honor.

4         MR. TISCIONE:  But he doesn't need to be told

5  that it's illegal.  It's a crime.

6         MR. SAPONE:  We're talking about the notice.

7         MR. TISCIONE:  I don't care that he wasn't

8  charged with it until October.

9         THE COURT:  How many false claims would there

10 be for Arthur post-October 2007?

11        MR. TISCIONE:  October '07?  All of them; 27.

12        MR. SAPONE:  He's put on notice on August 14

13 2008.  Immediately gets private insurance.  Would never

14 use a Medicaid card when he has private insurance through

15 Oxford.  And what it boils down to, your Honor, again

16 this is so important, he hasn't -- it's $10,000 and it's

17 going to the doctor and getting medicine.  So when we

18 talk about danger to the community, the only danger here

19 is that he would continue to use Medicaid benefits.  But

20 he wouldn't do it because he has Aetna.

21        And then with respect to risk of flight, I just

22 want to say something about the overseas ties and travel.

23 He has traveled ten times since he has been released in

24 this case, as far as Hawaii.  He has come back every

25 single time and does not have overseas ties or overseas

29

**Proceedings**

1  business.  He is a local salesman for Eugene Dozortsev's

2  wine company.  And, in fact, he just picked up an account

3  in my office building at One Penn Plaza where he sells

4  cases of wine to Lugo Restaurant.  That's what Arthur

5  does.  Arthur has nothing to do with foreign sales of

6  products or traveling or anything of the like.

7            THE COURT:  Sentencing is when?

8            MR. TISCIONE:  For Arthur --

9            MR. SAPONE:  April 22.

10           MR. TISCIONE:  April 22 for Arthur and Nikolai

11 -- do you remember the sentencing date?

12           MR. ZONE:  I don't --

13           MR. TISCIONE:  I think it's May 21 for Nikolai.

14           MR. SAPONE:  Okay.  So then June Sifton put it

15 on in May.

16           MR. ZONE:  I just would want to indicate one

17 thing.  As soon as we have this -- I know that

18 Mr. Tiscione is indicating that, you know, they should

19 have known they were committing crimes.  The focus of

20 resolving this case was resolving whatever Medicaid

21 issues existed, whatever money laundering issues;

22 whatever issues that are in here were all resolved as

23 part of this plea.

24           Mr. Dozortsev when I was advised that the

25 government believed he was committing Medicaid fraud,

30

**Proceedings**

1   immediately canceled his Medicaid coverage; immediately,

2   okay, for the entire family.  And then a couple of months

3   -- two to three months later, he realizes that he just

4   can't survive.  Financially, he's making very little

5   money.

6           THE COURT:  And so what?

7           MR. ZONE:  And so he reapplied and that point

8   was -- is and was entitled and eligible for that type of

9   coverage, Judge.

10          THE COURT:  All right.  I have heard enough.  I

11  think that there are significant enough distinctions

12  between the two brothers that I am going to do the

13  following.  You are Arthur; right?  You are Arthur; okay.

14          You are going to be on complete electronic

15  monitoring, no going to work.  You are not going

16  anywhere.  You are a complete lock down, house arrest

17  until sentencing.

18          And you are remanded, Nikolai.  I cannot accept

19  -- I think it's almost a complete affront to the Court

20  the excuses I am hearing about your conduct post-arrest

21  and post-plea.  It's simply not acceptable.

22          MR. ZONE:  Judge, may I have a moment?

23          THE COURT:  I don't want to hear.  No.

24          MR. ZONE:  Just one moment.

25          THE COURT:  You shouldn't interrupt me.

31

**Proceedings**

1      MR. ZONE:  I am sorry.

2      THE COURT:  It's unambiguous when defendants

3 are advised you are not to commit any crimes while you're

4 out on this bond, if you do so it will be a violation of

5 your bail conditions and it's also a separate crime;

6 unambiguous, completely clear.  I don't accept your

7 excuses; remanded.

8      MR. ZONE:  May I have one minute?

9      THE COURT:  And your bail conditions are

10 changed.  Complete house arrest, electronic monitoring

11 until sentencing.

12      MR. TISCIONE:  Your Honor, the government would

13 ask that the Court also impose the additional bond of

14 having the defendant post his house.

15      THE COURT:  Wait, so right -- Arthur has the

16 condominium.  What is posted?

17      MR. SAPONE:  He lives in a condo apartment here

18 in Manhattan.

19      MR. TISCIONE:  Which is not posted.

20      THE COURT:  And where is the -- so there's no

21 property posted?

22      MR. TISCIONE:  There is a property posted but

23 it's his friend's property.

24      THE COURT:  And what does he have to post in

25 addition?

32

## Proceedings

1          MR. SAPONE:  The apartment he lives in with his

2   fiance.

3          THE COURT:  Oh, that's what you want posted?

4          MR. TISCIONE:  That's what I want posted.

5          THE COURT:  Yes, that should be posted; yes.

6   And that can be done --

7          MR. SAPONE:  444 West 19th Street, New York

8   City.

9          THE CLERK:  Solely owned by Arthur?

10          MR. SAPONE:  Solely owned by Arthur.

11   Your Honor, just to be clear, if Arthur has to -- and I

12   hesitate to ask this question given all of the talk

13   that's gone on --

14          THE COURT:  Go to the doctor's is what you were

15   going to ask.

16          MR. SAPONE:  -- go the doctor --

17          THE COURT:  Why isn't --

18          MR. SAPONE:  -- or visit his lawyer because

19   we're preparing for sentencing, in other words, can I

20   apply to the Court?

21          THE COURT:  Yes.

22          MR. SAPONE:  Thank you.

23          MR. ZONE:  Your Honor, the only -- I just

24   wanted to add one thing.  I was speaking to my client,

25   okay?

33

**Proceedings**

1          THE COURT:  Okay, yes.  You can go ahead.

2          MR. ZONE:  That he canceled his insurance; not

3    one crime was committed.  Not one crime was committed,

4    your Honor.  And then when he was eligible for Medicaid,

5    he reapplied for Medicaid.  This is important that he

6    wants the Court to --

7          THE COURT:  Okay, thank you.  I hear you.

8          So we need the other suretor up on -- don't we

9    need -- is his girlfriend on the bond?

10         MR. SAPONE:  She is not.

11         MR. TISCIONE:  Alexander Bromberg is --

12         THE COURT:  Is on the bond?

13         MR. TISCIONE:  Yes.

14         THE COURT:  I am going to choke.

15         MR. TISCIONE:  Sorry, I forgot to mention that

16   there's so many issues in this case, the other suretor on

17   the bond was just arrested this morning.

18         THE COURT:  The suretor on Mr. Dozortsev's

19   bond --

20         MR. TISCIONE:  Yes.

21         THE COURT:  -- was the defendant I arraigned?

22         MR. TISCIONE:  Yes.

23         THE COURT:  So --

24         MR. TISCIONE:  Healthcare fraud.

25         THE COURT:  The tall gentleman.  Now, so who --

34

**Proceedings**

1          MR. TISCIONE:  Actually, you know, I very much

2     apologize, your Honor, but given that, I would ask that

3     the defendant has to be remanded.  There's simply no --

4     there's no equity in the property.

5          THE COURT:  Well, no, hold on.  That

6     Mr. Bromberg put the property up?

7          MR. TISCIONE:  Yes, yes.  That's the property

8     securing Mr. Arthur Dozortsev's bond.

9          THE COURT:  What did we do with Mr. Bromberg?

10    Was he --

11         MR. TISCIONE:  He was released on a $1 million

12    bond posted with other property.

13         THE COURT:  Well this is new.

14         MR. SAPONE:  Your Honor, I think if we look at

15    the bail --

16         THE COURT:  So who do you have -- so right now

17    Bromberg is on this bond.

18         MR. SAPONE:  Well, his property is.

19         THE COURT:  His property.  But you have an

20    additional property which is the property he lives in.

21         MR. SAPONE:  It's the property he lives in with

22    his fiance and it has equity of $600,000.

23         THE COURT:  Yes, I will take that.

24         MR. SAPONE:  All right.  Thank you.  So are we

25    free to go?

35

**Proceedings**

1        THE COURT:  No, we need his fiance.  Did she

2   sign -- has she signed the bond?

3        MR. SAPONE:  She didn't.  Do you want her to?

4        THE COURT:  Yes.

5        MR. SAPONE:  Okay.

6        THE COURT:  She needs to sign it.  Is she a --

7        MR. SAPONE:  No, no, but she has no ownership

8   interest in the apartment.  She just moved in with

9   Arthur.

10        THE COURT:  Oh, oh.  So he's the sole owner of

11   the apartment?

12        MR. SAPONE:  Correct.  Correct.

13        THE COURT:  Okay.  So he's going to be able to

14   -- can he use that for collateral?  Can he use that?

15        MR. SAPONE:  Yes.

16        THE COURT:  Okay.

17        MR. SAPONE:  So can he be released until I get

18   the paperwork together?  I mean --

19        THE COURT:  Yes.

20        MR. SAPONE:  -- it's right here in Manhattan.

21        THE COURT:  He can sign the bond.

22        MR. SAPONE:  All right.

23        THE COURT:  He needs to sign the bond.

24        MR. SAPONE:  All right.  May I?

25        THE COURT:  All right.  So you understand,

36

## Proceedings

1  we've gone over this.  Now your bail conditions are you

2  are on complete house arrest until your sentencing and

3  you can only leave for approved attorney visits or a

4  medical emergency.  And the property you live in, the

5  co-op or the condo is going to now be securing your bond.

6          THE DEFENDANT A. DOZORTSEV:  Yes, ma'am.

7          THE COURT:  And the government can decide what

8  the want to do about Mr. Bromberg.

9          MR. SAPONE:  Okay.  Thank you for your

10  consideration, your Honor.

11          (Matter concluded)

12                  -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

37

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **7th** day of **April** , 2009.



Rosalie Lombardi
Transcription Plus II

Transcription Plus II        Rosalie Lombardi